UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Court File No. 18-cr-312 (MJD/LIB) (1) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Timothy Owen Rootes, | |
| Defendant. | |

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, and upon Defendant Timothy Owen Rootes' (hereinafter "Defendant") Motion to Suppress Evidence Obtained Through Illegal Search and Seizure. [Docket No. 21].

The Court held a motions hearing on March 11, 2019, regarding the parties' pretrial motions.[1] At the motions hearing, the parties requested the opportunity to submit supplemental briefing, which was completed on March 25, 2019, at which time Defendant's Motion to Suppress Evidence Obtained Through Illegal Search and Seizure, [Docket No. 21], was taken under advisement.

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Evidence Obtained Through Illegal Search and Seizure, [Docket No. 21], be **DENIED**.

---

[1] The Court addressed the Government's pretrial motion for discovery and production of evidence by separate Order. [Docket No. 27].

I.  **BACKGROUND AND STATEMENT OF FACTS**

   A. **Background**

On December 18, 2018, Defendant was indicted with one count of conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846; two counts of possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 841(b)(1)(B); and one count of felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Indictment [Docket No. 1]).

   B. **Facts[2]**

In his Motion to Suppress Evidence Obtained Through Illegal Search and Seizure, [Docket No. 21], Defendant moves the Court for an Order suppressing any evidence obtained as a result of the stop and search of Defendant's automobile on March 17, 2018, near Flagstaff, Arizona, as well as, an Order suppressing any statements Defendant made during the March 17, 2018, traffic stop. (Def.'s Mot. to Suppress [Docket No. 21]).

The record presently before the Court indicates that on March 17, 2018, at approximately 4:00 p.m., Arizona State Trooper Jay Hutton (hereinafter "Trooper Hutton") initiated a traffic stop of Defendant for following the vehicle in front of him too closely in violation of Arizona Revised Statute § 28–730. (March 11, 2019, Motions Hearing, Digital Recording at 10:02–10:03 a.m.). Defendant was driving a black Ford pickup truck (hereinafter "Truck"). (Id. at 10:03–10:04 a.m.).

When Defendant drove past Trooper Hutton, who was parked on the side of the highway at the time, Trooper Hutton estimated that Defendant was driving the Truck approximately two

---

[2] Except where expressly indicated otherwise, the Court's statement of facts is derived from the testimony of Arizona State Trooper Jay Hutton at the March 11, 2019, motions hearing, and from Government's Exhibit 1, which is a dashboard video recording from Trooper Hutton's police vehicle. At the motions hearing, the Government, without objection, offered the video recording into evidence as Government's Exhibit 1. (March 11, 2019, Motions Hearing, Digital Recording at 10:04–10:05 a m.).

2

vehicle lengths behind the car in front of him. (Id.). As Defendant drove past him, Trooper Hutton testified that he also observed that the Truck had a Minnesota license plate, that it was clean, that Defendant was the only person in the vehicle, and that he had a "concerned" look on his face. (Id. at 10:08–10:09 a.m.).

Upon pulling his police vehicle out onto the highway and following Defendant's Truck, Trooper Hutton testified that he measured the gap time between Defendant's Truck and the car he was following as being approximately .41 seconds. (Id. at 10:05–10:06 a.m.).

According to the video recording from Trooper Hutton's dashboard camera, at approximately 4:03:30 p.m. Trooper Hutton turned on his emergency lights to initiate the traffic stop of Defendant. (Gov't Ex. 1 at 0:30–1:00). Defendant pulled the Truck over to the shoulder of the highway and stopped the vehicle approximately 30 seconds later. (Id. at 0:30–1:20).

After pulling Defendant over on the side of the highway, Trooper Hutton walked toward the passenger's side window of the Truck. (Id. at 1:20–1:25). Upon walking up to the Truck, Trooper Hutton testified that he smelled an "overwhelming" amount of air freshener coming from the Truck. (March 11, 2019, Motions Hearing, Digital Recording at 10:19–10:20 a.m.). After walking up to the passenger's side door of the Truck, Trooper Hutton asked Defendant if he was traveling with the car in front of him and Defendant answered that he was not. (Gov't Ex. 1 at 1:30–2:00). Trooper Hutton then informed Defendant that he pulled him over because Defendant was following the car in front of him too closely and asked Defendant for his driver's license and insurance information. (Id. at 1:20–2:15). Defendant responded that he did not have his driver's license on his person but informed Trooper Hutton that it was issued by the state of Minnesota. (Id. at 2:45–3:00). Trooper Hutton again asked Defendant for the Truck's insurance and registration information. (March 11, 2019, Motions Hearing, Digital Recording at 10:13–10:14

a.m.). Defendant began looking through his phone for it. (Gov't Ex. 1 at 2:45–3:15). Trooper Hutton testified that, while Defendant was looking for the Truck's registration and insurance information, he observed that Defendant's hand was shaking. (March 11, 2019, Motions Hearing, Digital Recording at 10:15–10:16 a.m.). Trooper Hutton then asked Defendant if he had anything else with his picture on it, to which Defendant responded that he did not. (Gov't Ex. 1 at 2:45–3:00).

While Defendant was still looking for the Truck's insurance and registration information on his phone, Trooper Hutton asked Defendant if he would walk with him back to his patrol vehicle so he could begin the appropriate paperwork. (Id. at 3:15–3:45). Defendant exited the Truck and walked with Trooper Hutton to the passenger's side of his patrol vehicle. (Id. at 3:45–4:00). Trooper Hutton testified that he observed that Defendant was wearing shorts and a t-shirt, as well as, perspiring though the temperature was relatively cool outside. (March 11, 2019, Motions Hearing, Digital Recording at 10:12–10:13 a.m.).

Trooper Hutton next asked Defendant when he arrived in Phoenix, Arizona. (Id. at 4:00–4:25). Defendant told Trooper Hutton that he had left from Minnesota on Monday and arrived in Phoenix three days later on Thursday, March 15, 2018. (Id. at 4:00–4:25). Defendant told Trooper Hutton that he was visiting Phoenix because he wanted to attend a spring training game for professional baseball, as well as, a tattoo convention. (Id. at 4:30–4:45). While still standing next to Trooper Hutton's patrol vehicle, Trooper Hutton next asked Defendant what his name was, to which Defendant responded that his name was "Kent Hilderbridle." (Id. at 4:45–5:00).Trooper Hutton also asked Defendant for his social security number and Defendant responded that he did not know it. (Id. at 5:00–5:30). Trooper Hutton then asked Defendant if he carried a wallet and Defendant responded that he did not. (Id. at 5:30–5:45).

Defendant told Trooper Hutton that he had been staying at the Victoria Inn in Glendale, Arizona. (Id. at 6:00–6:30). Defendant also told Trooper Hutton that he did not actually attend a baseball game because, when he arrived in Phoenix, he learned that the tickets to the game were expensive. (Id. at 6:30–7:00).

At one point while Trooper Hutton and Defendant were standing next to the patrol vehicle and talking, Defendant attempted to make a phone call. (Id. at 7:30–8:00).

While Trooper Hutton was filling out paperwork, Defendant turned away from Trooper Hutton and took a step back towards the Truck. (Id. at 8:00–8:15). Defendant then briefly paused, looked back at Trooper Hutton, then turned back towards the Truck and began walking towards it. (Id. at 8:10–8:30). At that point, Trooper Hutton asked Defendant where he was going and told him to come back towards his police vehicle. (Id. at 8:15–8:30). Defendant complied and leaned against the police vehicle. (Id. at 8:15–8:30).

Trooper Hutton then asked Defendant what his address in Minnesota was and Defendant told it to him. (Id. at 8:30–8:45). Trooper Hutton also asked Defendant why he was acting so nervous and Defendant responded that he was "excited." (Id. at 8:45–9:00). Defendant also stated that he could not afford a ticket. (Id. at 9:00–9:15). When Defendant was talking to him, Trooper Hutton testified that he observed that Defendant was speaking "very rapidly," kept scratching his head, and repeatedly broke eye contact. (March 11, 2019, Motions Hearing, Digital Recording at 10:20–10:22 a.m.).

At approximately 4:12:30 p.m., Sergeant Anthony Gerard arrived (hereinafter "Sergeant Gerard"). (Gov't Ex. 1 at 9:15–10:00). When he arrived, Trooper Hutton asked him if he would finish up Defendant's paperwork related to the traffic stop. (Id. at 9:30–10:00). Sergeant Gerard then took over the tasks related to the traffic stop and, as he did so, Trooper Hutton deployed his

5

drug dog, Enzo[3], along the driver's side of the Truck, starting at the back end closest to the police vehicle. (Id. at 10:20–10:40). When Enzo got to the driver's side door of the Truck, he alerted that there were drugs present. (Id. at 10:20–10:40). Trooper Hutton testified that the drug dog's alert caused him to search the Truck. (March 11, 2019, Motions Hearing, Digital Recording at 10:27–10:28 a.m.).[4]

Trooper Hutton returned Enzo to the police vehicle and walked to the passenger's side of the Truck and opened the rear passenger door. (Gov't Ex. 1 at 11:20–11:40). After opening the Truck's door, Trooper Hutton testified that he saw a jacket sitting on top of a box in the backseat. (March 11, 2019, Motions Hearing, Digital Recording at 10:27–10:29 a.m.). Trooper Hutton further testified that he moved the jacket and saw that the box it was on top of was open and appeared to contain multiple bags of what he believed to be illegal drugs. (Gov't Ex. 1 at 12:45–13:15). At this point, Trooper Hutton drew his taser and signaled to Sergeant Gerard that he discovered drugs. (Id. at 12:45–13:15). Sergeant Gerard then handcuffed Defendant. (Id. at 13:10–13:25). Trooper Hutton next asked Defendant whether there was heroine or methamphetamine in

---

[3] Trooper Hutton is a K9 unit, and Enzo was in Trooper Hutton's vehicle at all times prior to this point. (March 11, 2019, Motions Hearing, Digital Recording at 10:26–10:27 a.m.; Gov't Ex. 1).

[4] Relying on Arizona v. Gant, 556 U.S. 332 (2009), in which the Supreme Court held that police officers could not search the passenger compartment of a vehicle incident to an arrest without a warrant after the securing of the scene of the stop, Defendant argues that the search of the Truck was impermissible because Trooper Hutton was required to obtain a search warrant before searching the Truck. (Mem. in Supp., [Docket No. 28], at 3). Defendant, however, does not challenge that the drug dog alert created probable cause to conduct a warrantless search of the Truck, and in fact stipulated to the foundation of the drug dog sniff search at the motions hearing. (March 11, 2019, Motions Hearing, Digital Recording at 10:25–10:26 a.m.). Notably, the search conducted by Trooper Hutton was not a search incident to arrest as argued by Defendant because it was conducted before Defendant was arrested. Rather, Enzo alerted to drugs in the Truck before Defendant was arrested, (Gov't Ex. 1 at 10:20–10:40), which consequently gave Trooper Hutton probable cause to conduct a warrantless search of the Truck under the automobile exception to the warrant requirement, which he did. See, United States v. Sanchez, 417 F.3d 971, 976 (8th Cir. 2005) (finding that a positive alert from a K-9 provides probable cause to conduct a warrantless search of the vehicle under the automobile exception to the warrant requirement). Thus, because Trooper Hutton had probable cause to search the Truck, Trooper Hutton properly searched the Truck, found evidence of illegal drugs, and thereafter arrested Defendant. Thus, to the extent Defendant argues that Trooper Hutton was required to obtain a search warrant to search the Truck pursuant to Arizona v. Gant, his argument is without merit.

6

the bags that were in the box—Defendant did not answer. (Id. at 13:30–14:00). Sergeant Gerard then put Defendant in one of the patrol vehicles. (Id. at 14:50–15:05).

After Defendant was in a patrol vehicle, Trooper Hutton walked to the front driver's side door of the Truck and opened the door. (Id. at 17:45–18:15). When he opened the door, Trooper Hutton testified that he saw Defendant's Minnesota driver's license laying on the floor of the Truck. (March 11, 2019, Motions Hearing, Digital Recording at 10:29–10:30 a.m.).

Trooper Hutton asked Defendant if he had any outstanding warrants for his arrest and Defendant confirmed that he did. (Id. at 10:30–10:31 a.m.). Thereafter, Trooper Hutton testified that he ran Defendant's name and confirmed that Defendant had an outstanding warrant for his arrest. (March 11, 2019, Motions Hearing, Digital Recording at 10:30–10:31 a.m.).

In total, from the time Trooper Hutton initiated the traffic stop to the time the officers arrested Defendant lasted approximately fifteen minutes.

After the officers transported Defendant, Trooper Hutton testified that he arranged for the Truck to be towed and inventoried pursuant to Arizona's standardized vehicle removal policy.[5] (March 11, 2019, Motions Hearing, Digital Recording at 10:34–10:35 a.m.).[6]

---

[5] At the motions hearing, the Government, without objection, offered into evidence a copy of the Arizona Department of Public Safety's Vehicle Removal policy (hereinafter "Vehicle Removal policy") as Government's Exhibit 2. (March 11, 2019, Motions Hearing, Digital Recording at 10:34–10:35 a m.).

[6] Further addressing Defendant's argument that Trooper Hutton was required to get a search warrant to search the Truck, the Court notes that Defendant fails to acknowledge that the evidence of illegal drugs would have been discovered when law enforcement conducted an inventory search of the vehicle. Generally, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (citing Katz v. United States, 389 U.S. 347, 357 (1967)). A lawful inventory search is one of those exceptions. United States v. Frasher, 632 F.3d 450, 454 (8th Cir. 2011) ("[i]nventory searches are one of the well-defined exceptions to the warrant requirement of the Fourth Amendment."). In the present case, after Defendant was arrested, Trooper Hutton had the Truck Defendant was driving towed and inventoried pursuant to the Vehicle Removal policy. (Gov't Ex. 2). According to the Vehicle Removal policy, an officer may remove a vehicle if the person driving or in control of the vehicle is arrested for an alleged offense. (Id. at 2). Additionally, pursuant to the Vehicle Removal policy when an officer removes a vehicle, the officer "shall open and inspect all closed, unlocked containers." (Id. at 3). Thus, under the Vehicle Removal policy, Trooper Hutton was authorized to inspect what was inside the box in the back seat of the Truck and consequently would have lawfully discovered the drug evidence located in the Truck during an inventory search.

7

## II. DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED THROUGH ILLEGAL SEARCH AND SEIZURE. [DOCKET NO. 21].

Defendant moves the Court to suppress all evidence obtained as a result of the March 17, 2018, traffic stop, including, as a product of the allegedly unlawful stop, the statements that he made at the time of the stop.

### A.     Traffic Stop

Defendant first moves the Court to suppress evidence gathered as a result of the March 17, 2018, traffic stop of the Truck, arguing that Trooper Hutton did not have a reasonable articulable suspicion of unlawful activity on which to extend the duration of the stop under Rodriguez v. United States, 135 S. Ct. 1609 (2015), and thus should have obtained a search warrant to search the Truck.

### B.     Standard of Review

"The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) (quoting U.S. Const. amend. IV). Roadside traffic stops constitute seizures for the purposes of the Fourth Amendment. See, e.g., Delaware v. Prouse, 440 U.S. 648, 653 (1979). To be lawful, a traffic stop must be supported by at least a reasonable, articulable suspicion that a crime is being committed. Jones, 269 F.3d at 924 (citing Prouse, 440 U.S. at 663).

Once a stop has been lawfully initiated, the officer is entitled to conduct an investigation, the scope of which must be reasonably related to the circumstances which gave rise to the stop. Rodriguez, 135 S. Ct. at 1614; Terry v. Ohio, 392 U.S. 1, 20 (1968); See also, United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990), cert. denied, 502 U.S. 962 (1991). "The scope of a Fourth Amendment intrusion 'will vary to some extent with the particular facts and circumstances

8

of each case. Jones, 269 F.3d at 924 (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)). "The scope of the detention must be carefully tailored to its underlying justification." Royer, 460 U.S. at 500. "A traffic stop can become unlawful, however, if it is "prolonged beyond the time reasonably required" to complete its purpose." United States v. Olivera-Mendez, 484 F.3d 505, 509 (8th Cir. 2007) (quoting Illinois v. Caballes, 543 U.S. 405, 408 (2005)). Accordingly, for an officer to lawfully prolong a stop beyond the time reasonably necessary to complete the tasks relating to the basis for the stop, the officer must have a reasonable articulable suspicion of further criminal activity. Rodriguez, 135 S. Ct. at 1615.

**B.     Analysis**

Although Defendant generically refers to the stop in this case as "illegal," he does not otherwise dispute that he was initially properly stopped for a traffic violation, and it is well-established that any traffic violation, no matter how minor, will provide probable cause to justify a traffic stop.[7] See, e.g., United States v. Houston, 548 F.3d 1151, 1153 (8th Cir. 2008); United States v. Coney, 456 F.3d 850, 857 (8th Cir. 2006) ("We completely agree . . . that [the officer] had probable cause to stop the . . . van because he objectively had a reasonable basis for believing that the van was speeding.").

The Court finds credible Trooper Hutton's testimony that Defendant was following the automobile in front of him at an unsafe distance. In Arizona, following the vehicle in front of you too closely is an independent traffic violation that will justify initiating a traffic stop of the vehicle. See, A.R.S. § 28–730; State v. Sweeney, 224 Ariz. 107 (Ct. App. 2010) Accordingly, Trooper Hutton lawfully stopped Defendant's vehicle on that basis.

---

[7] While Defendant states that the traffic stop was "illegal," he does not further explain his argument in his Memorandum as to why he contends the traffic stop was illegal.

9

Defendant contends that, even if the initial stop was lawful, it became unlawful when Trooper Hutton unreasonably expanded the stop by deploying a drug dog around the Truck. In support, Defendant relies on Rodriguez v. United States, 135 S. Ct. 1609 (2015).

The Government, however, asserts that the dog sniff occurred during the period of time still necessary to complete the traffic stop.

"[I]f a defendant is detained incident to a traffic stop, the officer does not need reasonable suspicion to continue the detention until the purpose of the traffic stop has been completed." United States v. Bueno, 443 F.3d 1017, 1025 (8th Cir. 2006). Occupants of the vehicle may be detained "while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation." United States v. Riley, 684 F.3d 758, 764 (8th Cir. 2012). These tasks can include "a computerized check of the vehicle's registration and the driver's license and criminal history, as well as the preparation of a citation or warning." United States v. Quintero–Felix, 714 F.3d 563, 567 (8th Cir. 2013). The officer may also ask questions about the occupant's travel itinerary. United States v. McCarty, 612 F.3d 1020, 1024–25 (8th Cir. 2010).

Furthermore, the Supreme Court has held that "the use of a well-trained narcotics-detection dog . . . during a lawful traffic stop, generally does not implicate legitimate privacy interests." Illinois v. Caballes, 543 U.S. 405, 409 (2005). Thus, "as long as a traffic stop is not extended in order for officers to conduct a dog sniff, the dog sniff is lawful." United States v. Fuehrer, 844 F.3d 767, 773 (8th Cir. 2016); See also, United States v. Olivera-Mendez, 484 F.3d 505, 509 (8th Cir. 2007) ("When a traffic stop is lawful at its inception and otherwise executed in a reasonable manner, a dog sniff conducted during the stop does not infringe on a constitutionally protected privacy interest." (internal quotations omitted)).

In the present case, Sergeant Gerard arrived at the site of the traffic stop while Trooper Hutton was in the process of completing tasks related to the traffic stop, namely attempting to identify the Defendant and filling out paperwork. After he arrived, Sergeant Gerard took over the tasks related to the traffic stop and Trooper Hutton removed Enzo from his squad car and conducted the dog sniff around the Truck while Defendant was leaning against Trooper Hutton's patrol vehicle waiting for Sergeant Gerard to complete the tasks related to the traffic stop. Thus, there is no evidence that the dog sniff unlawfully prolonged the traffic stop beyond what was reasonably necessary to complete the traffic stop.

To the extent Defendant argues that the traffic stop was unreasonable in length, this Court finds that argument unpersuasive.

Whether a particular detention is reasonable in length is a fact-intensive question, and there is no per se time limit on all traffic stops. United States v. Olivera-Mendez, 484 F.3d 505, 509 (8th Cir. 2007). When there are complications in carrying out the traffic-related purposes of the stop, for example, police may reasonably detain a driver for a longer duration than when a stop is strictly routine. See, United States v. Sharpe, 470 U.S. 675, 685–87 (1985).

In the present case, the length of Defendant's detention was not unreasonable. Several circumstances caused Trooper Hutton's stop of Defendant to take longer than a usual "routine" traffic stop. It took time to attempt to identify the Defendant because Defendant told Trooper Hutton that he did not have his driver's license, did not carry a wallet, did not know his social security number, and gave Trooper Hutton a false name. Defendant also told Trooper Hutton that he did not have any other form of identification with his picture on it that would confirm his identity. Additionally, when asked for the Truck's registration and insurance information, Defendant spent a considerable amount of time searching unsuccessfully for that information.

11

When asked who owned the Truck, Defendant told Trooper Hutton that it belonged to his girlfriend. Thus, the tasks related to the traffic stop took longer than normal because Defendant presented unusual circumstances and incomplete identifying information. See, Olivera-Mendez, 484 F.3d at 510 (finding that unusual vehicle documentation presented to the officer during a traffic stop justified the traffic stop taking "longer than normal").

Accordingly, because the dog sniff by Enzo was conducted during the duration of the traffic stop, this Court finds that it was lawful.

Even assuming solely for the sake of argument that the tasks associated with the traffic stop were completed and the stop was prolonged prior to the dog sniff, the Court finds that there was still reasonable suspicion to justify further detention of Defendant.

Once an officer finishes the tasks associated with a traffic stop, "the purpose of the traffic stop is complete and further detention . . . would be unreasonable unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify further detention[.]" United States v. Flores, 474 F.3d 1100, 1103 (8th Cir. 2007) (internal quotation marks and citations omitted). A court considers the totality of the circumstance, based on common sense judgments and inferences about human behavior, when determining whether an officer had "at least a minimal level of objective justification" for prolonging a traffic stop. United States v. Stringer, 739 F.3d 391, 395 (8th Cir. 2014) (citing Illinois v. Wardlow, 528 U.S. 119, 125 (2000)).

Defendant contends that, even if the initial stop was lawful, it became unlawful when Trooper Hutton unreasonably expanded the stop by deploying a drug dog to the Truck. In support of his argument, Defendant relies on Rodriguez v. United States, 135 S. Ct. 1609 (2015).

In response, the Government in essence asserts that the extension was only a *de minimis* detention. However, the Supreme Court in Rodriguez held that even *de minimis* extensions of a

traffic stop must be supported by a reasonable articulable suspicion of criminal activity. Rodriguez, at 1615.

In Rodriguez, a canine-paired officer stopped Rodriguez for driving on the shoulder, a traffic violation. Id. at 1613. After the officer completed all tasks relating to the basis for the stop, he asked Rodriguez for permission to allow his dog to conduct a sniff-search of the exterior of Rodriguez's vehicle. Id. Rodriguez did not consent. Id. The officer then detained Rodriguez for approximately seven additional minutes while he waited for a second officer to arrive, then retrieved his dog and conducted a sniff-search of the exterior of the vehicle, during which the dog indicated the presence of narcotics in the vehicle. Id. As a result, Rodriguez was indicted on narcotics charges. Id. He later moved to suppress the evidence gathered as a result of the stop. Id. The Magistrate Judge recommended that the motion be denied, concluding that the officer did not have a reasonable articulable suspicion on which to prolong the stop after completing all tasks related to the initial stop, but reasoning that the seven-minute extension of the stop was a *de minimis* intrusion on Rodriguez's Fourth Amendment rights. Id. The district court and the Eighth Circuit agreed. Id. at 1614. The Supreme Court, however, reversed, holding that the officer had been required to have a separate reasonable articulable suspicion of criminal activity to extend the stop past the point at which he had completed all tasks related to the initial traffic stop. Id. at 1615.

The present case is readily distinguishable from the facts of Rodriguez. In Rodriguez, the Magistrate Judge concluded that the officer did not have any objectively reasonable articulable suspicion of further criminal activity beyond the initial basis for the traffic stop when he further detained Rodriguez. Here, in contrast, Trooper Hutton articulated specific additional facts that he observed during the stop. Those observations gave rise to an objectively reasonable suspicion that Defendant was engaged in additional criminal activity beyond merely driving too closely to the

13

vehicle in front of him. Those additional facts included: (1) Defendant's lack of driver's license, social security number, wallet, or any other identifying information; (2) the "overwhelming" smell of air freshener coming from the Truck; (3) Defendant's nervous appearance, signs of which included his hand shaking, perspiration, talking rapidly, scratching his head, repeatedly breaking eye contact, and the shocked looked on his face observed by Trooper Hutton; (4) Defendant's short trip to and from a source city[8]; (5) Defendant's inconsistent story for visiting a source city for only two days; and (6) that the registration of the Truck identified a female owner.

Courts have considered that a driver without a driver's license or other identification as supporting a reasonable articulable suspicion of criminal activity. See, e.g., United States v. Ramirez-Cubillas, 223 F. Supp. 2d 1049, 1056 (D. Neb. 2002). Other courts have considered strong smells from a vehicle interior as supporting a reasonable articulable suspicion of criminal activity. See, e.g., United States v. Christian, 43 F.3d 527, 530 (10th Cir. 1994) (noting that a freshly lit cigarette is a technique often used to mask the smell of drugs); See also, United States v. Alonzo, No. 15-cr-165 (JRT/LIB), 2015 WL 13731349, at *9 (D. Minn. Dec. 3, 2015). Additionally, the Eighth Circuit has found that being visibly "extremely nervous" during a traffic stop can contribute to a finding of reasonable suspicion. See, United States v. Anguiano, 795 F.3d 873, 877 (8th Cir. 2015) (finding that the defendants were visibly "extremely nervous" throughout the encounter, exhibiting high pulse rates and heavy breathing, and avoiding eye contact with the officer, all of which can contribute to a finding of reasonable suspicion). Inconsistent stories have also been deemed sufficient to give the officers probable cause that the defendants were involved in criminal conduct. United States v. Ameling, 328 F.3d 443, 449 (8th Cir. 2003). Courts have similarly considered that a short duration in a drug source city can support a finding of reasonable

---

[8] Arizona has been listed as a drug source state, United States v. Beck, 140 F.3d 1129, 1137 (8th Cir. 1998), and Phoenix has been identified as a drug source city. United States v. Fletcher, 91 F.3d 48, 50 (8th Cir. 1996).

suspicion. See, e.g., United States v. Sokolow, 490 U.S. 1, 4–9 (1989) (finding reasonable suspicion for drug smuggling where the defendants paid cash for airplane tickets, traveled under an alias, checked no luggage, and stayed in a drug source city for only 48 hours even though the round trip flight took 20 hours).

Again, assuming solely for the sake of argument that Trooper Hutton had completed the traffic stop before the dog sniff around the Truck, the present case is substantially similar to United States v. Suitt, 569 F.3d 867 (8th Cir. 2009), in which the period in question involved routine questioning related to the stop, and during which the defendant behaved in such a way as to raise the trooper's suspicions that the driver was engaged in criminal activity. As in this present case, the officer in Suitt became more and more suspicious during the traffic stop, thus leading him to reasonably believe that criminal activity was afoot and that a search (also via dog sniff) was warranted. As the Eighth Circuit noted in Suitt, "An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered." Id. (quoting United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002)). Based on his suspicions, the officer in Suitt asked drug interdiction questions after he issued the warning tickets. The Eighth Circuit ruled that there was reasonable suspicion to prolong the stop for additional questioning after the basis for the initial stop had been resolved.

The same reasoning applies here. During the time Trooper Hutton was carrying out the tasks related to the traffic stop, he noticed various things that raised his suspicions that Defendant may have been involved in criminal activity. Thus, even assuming solely for the sake of argument that Trooper Hutton had completed the traffic stop, this Court would still find that Trooper Hutton's limited prolongation of the stop of Defendant was based on reasonable and articulable circumstances and did not violate Defendant's Fourth Amendment rights.

15

Accordingly, the Court recommends **DENYING** Defendant's Motion to Suppress Evidence Obtained Through Illegal Search and Seizure, [Docket No. 21], to the extent that Defendant seeks to suppress evidence obtained during the March 17, 2018, traffic stop and subsequent vehicle search.

**B.** **Statements**

Defendant also moves the Court to suppress the statements that he made during the March 17, 2018, traffic stop. The only basis on which Defendant suggests that those statements should be suppressed is that they arose during the allegedly unlawful traffic stop and subsequent road side search of Defendant's vehicle on March 17, 2018, by Trooper Hutton.

Because the Court has already concluded that the dog-sniff search at issue here lawfully occurred during the traffic stop, Defendant's argument that his statements should be suppressed as tainted by the stop and vehicle search necessarily fails.

Accordingly, the Court recommends **DENYING** Defendant's Motion to Suppress Evidence Obtained Through Illegal Search and Seizure, [Docket No. 21], to the extent that Defendant seeks to suppress statements that he made during the March 17, 2018, traffic stop and subsequent search.

## IV. CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence Obtained Through Illegal Search and Seizure, [Docket No. 21], be **DENIED**, as set forth above.

Dated: April 5, 2019                                         s/Leo I. Brisbois
                                                             Leo I. Brisbois
                                                             U.S. MAGISTRATE JUDGE

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.